and we'll hear first from Mr. Indorff. Good morning, Your Honors, and may it please the Court. My name is Andrew Indorff with Longwell, Schuster & Goldberg, and I am pro bono counsel for Petitioner Provost Clement. So, this is not your run-of-the-mill petition for rebuke. Mr. Clement claims that he is a citizen of the United States and that he derived that citizenship through his father under a constitutional application of former AUSC Section 1432a3. This matters because Clement's citizenship claim calls into question the very jurisdiction of the agency over these deportation proceedings. That is why, since at least 1922 in the Ng Fung Ho case, the Supreme Court has held that when a petitioner defends against removal by asserting a claim of U.S. citizenship, he has a Fifth Amendment right to federal court adjudication of that citizenship claim. Yet on this petition for review, which has been filed within 30 days of the final order of the BIA, the government claims that this Court can dismiss the petition without any That is wrong. Not only as a matter of- Can I get you to, just to address something, just at the sort of the beginning, I think, to me at least, in the way to analyze the case, is what do we do with your client's motion to withdraw that was filed in front of the BIA? How do we, how do we analyze that? Right, so the government asserts two threshold jurisdictional defenses, and I want to touch on both of them. First, there's the exhaustion issue, and then the second is the timeliness issue, which relates to the BIA withdrawal order. And turning first to the withdrawal order, the government's argument is really that the petition for review is untimely, because it interprets the withdrawal order to sort of rewind the clock by which the 30-day time limit runs. And that's just an incorrect interpretation of the regulatory text, and it's also inconsistent with both the Sixth and the Ninth Circuits, which treat withdrawal orders as final orders of removal. And it also runs up against strong presumptions in favor of federal court jurisdiction, as well as the Ng Fung Ho case. So if we just turn back to the regulatory text there, when a BIA, when the BIA deems an appeal withdrawn, the regulation says that the underlying order of the immigration judge, quote, shall be final, to the same extent as if no appeal had been taken. And what that does is address two things, first, finality, and second, exhaustion. What it doesn't do is change the timing as it's relevant to Section B-1. So turning first to the finality requirement, you know, the statute says, shall be final. And that means what it says. Up until the BIA enters a withdrawal order, there is simply no appealable order by which a person in deportation proceedings can petition from. Once the immigration judge enters that final order of removal, and once the appeal to the action by the BIA to render that appeal an appealable order. So that's, that's simply what the withdrawal order does. Let's say I completely agree with you on that. It seems like we run into the problem there about what would be subject to our review. So we've got, let's just say we've got jurisdiction to evaluate something because of, you know, the BIA issued its order approving the withdrawal, and then you petitioned it timely from that. But the Tenth Circuit in a case written by Justice Gorsuch said, yeah, the thing that we're evaluating is the BIA's decision to allow the withdrawal. It's not the merits of the underlying claim. How do we get from jurisdiction to evaluate the BIA's decision to looking at the merits of the underlying claim? Absolutely. And I assume you're referring to the long case. Yes. And so in the ordinary course, that's precisely right, because the second clause of the statute where it says to the same extent as if no appeal had been taken, what that does is trigger application of the exhaustion requirement in 1252 D1. And so in the ordinary course, the court will have jurisdiction over the withdrawal order. It must decide the propriety of the withdrawal order, and courts of appeals do so all the time. But the application of that exhausting requirement in D1 will strip the court of jurisdiction over the underlying merits. Now here, that exhaustion bar doesn't apply. And that's where the government's argument fails, because the exhaustion requirement by its text applies only to an alien, doesn't apply to a U.S. person. And this court always has jurisdiction to determine whether or not the underlying facts exist for a jurisdiction stripping provision to apply. That's what the Second Circuit said. That's what the Fifth Circuit said. That's what the Eighth and the Ninth Circuits have all said. The rule otherwise would create circuit split in a uniform out-of-circuit law. Yeah, but I guess those weren't cases, though, correct me if I'm wrong, but I thought that those were not cases where there was a motion to withdraw filed by the petitioner. Am I right about that? That's correct. Those cases are not. So that's what I'm trying to figure out. Like, why is the thing in front of us not, did the BIA appropriately rule on the motion to withdraw the notice, I want to withdraw it, whatever you want to call it? Why isn't that the only issue in front of us? And then if we were to find that the BIA erred in resolving that issue, then we would remand or perhaps we would move on to some other issue to the merits. But it seems to me that the first step, I guess I'm looking for your best argument why the first step for us to get to the merits wouldn't be that the BIA erred in accepting the motion to withdraw. A couple of responses, Judge Brasher. First of all, the reason why a petitioner may have failed to exhaust administrative remedies has no bearing on whether or not that requirement applies. And what we're saying here is simply that because the petitioner has asserted a citizenship claim, which is a unique claim here, a claim which the Constitution obligates this court to decide and Section 1252B5 requires this court to decide. So your point, then, in response to my question is, yeah, that all might make sense in some other kind of context, but the uniqueness of the citizenship claim here resolves that. Well, it's two things, respectfully. So it's not just, it is about the nature of a citizenship claim, but it's about the interaction between a citizenship claim and the exhaustion requirement. So Judge Timkovich on the Tenth Circuit said that a court of appeals always, underscore, always retains jurisdiction to decide jurisdictional facts, such as whether or not a petitioner is a United States citizen. And what that means here, again, if you look at the statutory text of the exhaustion requirement, by its text, it only applies to an alien. So regardless of whether or not a petitioner failed to exhaust administrative remedies because he withdrew his appeal or simply litigated other issues before the BIA, that exhaustion bar does not apply. And this is consistent with the statutory scheme as a whole. The Supreme Court said in Augusto that when creating the procedures by which federal courts of appeals decide citizenship claims, it was not intending to create a burdensome process. And that's because a claim of U.S. citizenship is a right that is connected to all other rights. It's essential that the court decide a claim of citizenship before a person is removed. Now, if you don't have any further questions. Let me ask you about standing. The government has raised the issue of standing, saying that your client, you have to be, a litigant lacks standing to constitutionally challenge a statute unless they are personally adversely affected by the statute. And the government has argued that in this case, because Mr. Clement's father legitimated him, he could not have derived citizenship from either his father or his mother under A3 because the former statute doesn't treat either his father or his mother differently based upon their biological sex that would be relevant to his circumstances. He could not have gained citizenship through either because of the legitimation. So I disagree with the government's argument on standing for a couple of reasons. First of all, there's no doubt that Mr. Clement satisfies Article 3. He suffered an injury. In fact, he's being removed from the United States, notwithstanding a claim of U.S. citizenship. It's traceable to the former version of 1432 A3, and it's redressable by an order declaring him a citizen of the United States. The government's standing argument, or what it calls a standing argument, is really an argument on the merits as to whether or not the similarly situated requirement is met. And the government errs because it focuses on whether or not, it focuses on Clement rather than focusing on Clement's father, and whether or not Clement's father is similarly situated to his mother under Clause 2, what I'll call Clause 2 here of 1432 A3. So if you look at that provision of the statute, what it does is it, the existing statute creates effectively a proxy for a circumstance in which an unmarried mother would have sole custody of her non-marital children, and can therefore transmit citizenship to him. And what the statute doesn't do, so what it does- It's not necessarily sole custody, right? I mean, it's only when the father, only when there's no legitimation that's been shown. I mean, it's not necessarily in a sole custody case, in a sole, right? I mean, if both parents had at some point, if the child is legitimated, then don't both parents have to have signed off on it unless one of the parents has sole guardianship? So to answer your question, the current application or the current version of the statute of Clause 2, you're right, it applies where an unmarried mother has an out-of-wedlock child and the father has not legitimated that child. And what we're arguing is that that provision of the existing statute, that's all well and good, but it operates on a presumption, an assumption that that's the only circumstance in which an unmarried parent might have a sole custodial relationship with their child. And what we're arguing here is that there is another circumstance. There's a gap in the statute that Congress didn't accept, didn't account for, because an unmarried father can have that same relationship to the child. And in Morales-Santana, the Supreme Court said that when you're evaluating the similarly situated requirement, Judge Branch, look at whether or not the two parents are similarly situated with respect to their relationship to the child. And there's really no question that the nature of the relationship between the two parents here is substantially the same. That's what the government is arguing as to the merits, that because Mr. Clement was legitimated, his mother could not have transmitted citizenship to him if she had naturalized without the father, if the father had not naturalized any more than the father was able to transmit citizenship based on his naturalization alone. And because of the circumstances of his legitimation, his parents share that same distinction, that he can't get citizenship except through both. Well, again, I think that the problem there is that it focuses the standing analysis on Clement rather than on the similarly situated nature of the parents, which is where the Supreme Court in Morales-Santana says the analysis needs to focus. I'd like to just spend a moment on the government's two other cases. It cites Wynne and Levy. The Wynne case, neither of those cases are relevant here. Wynne, actually, I realize, Your Honor, that my time is up. I could continue or I could... Well, that's up to you. You have reserved three minutes for rebuttal. If you want to use some of that time now, you're welcome. Well, I actually have a question. Okay. Related to Wynne. I'm struggling with how you get around Wynne, how Wynne isn't providing the framework under which we're going to analyze this case. Well, I think I would agree that Wynne provides a relevant framework, and I would argue that Wynne compels the opposite conclusion here. So in Wynne, that was Section 1409, and the relevant statute there allowed both mothers and fathers, both mothers and fathers, that's an important point, to transmit citizenship to their non-marital children. And what it did, what the statute did was say that an unmarried father can transmit citizenship if he complies with certain additional criteria to show a filial tie. Now, that requirement withstood constitutional scrutiny because it was a minimal additional burden on a father, and it was related to a real difference. The difference between Wynne and this case is that former Section 1432A3 provides a categorical bar, an insurmountable hurdle to any father that wishes to transmit citizenship to his out-of-wedlock child. So that's different from Wynne. You cannot call the nature of that burden a minimal burden, and it's also not at all related to the filial tie of the child. If it were, Mr. Clement would easily satisfy that test because there's really no question that he had legal custody of his child, that he had a real meaningful relationship with his child at the time that he naturalized as a U.S. citizen. I'm happy to answer any further questions. Yeah, so go back to the exhaustion requirement. So your point is that the exhaustion requirement uses the word alien, and so that we would have to make a determination about whether the petitioner is an alien or a citizen in order to determine whether to apply that requirement. Explain to me this. I mean, so it seems like the question here is not whether, well, you have a legal argument that the statutes were unconstitutionally applied to deny him citizenship, correct? That's correct. But there is no factual question about whether he's an alien or U.S. citizen under those statutes? Under the existing statute, well, under former section 1432a3 as applied. No, he does not satisfy those requirements. Okay, so why is it, I guess I would understand your position on exhaustion a little bit better if there were sort of a factual dispute about, you know, who his mother was or who his father was or his claim about living in the United States for a certain period of time or something like that, to make that kind of determination to decide whether the exhaustion requirement applies? I'm having a little bit harder time seeing how we would have to analyze like a constitutional claim to the underlying statutes to determine whether he was an alien or a citizen or not. Can you just explain to me why your legal argument about the constitutional statutes would be something we would have to determine to answer the exhaustion question? Of course, Your Honor. So I think the simplest answer is that if former section 1432a3 violates the Constitution, then Mr. Clement is a citizen of the United States. He became a citizen of the United States when he lawfully entered this country, period. That is a citizenship claim, and that is an entitlement to citizenship no less than if the claim turned on a factual dispute. And courts of appeals have said the same thing. In the Fifth Circuit decision in Nehmeh, which is cited in our briefs, the court says that under section 1252b5, consistent with his Fifth Amendment right, the Court of Appeals in the Fifth Circuit must decide whether or not the exhaustion requirement applies or must decide whether or not section 1432a3 is constitutionally applied. And it must make that decision before applying the exhaustion bar. So that case is on all fours here, and consistent rules have been followed by courts of appeals across the country. What would you have the—how do you think the section should read if you were to succeed? Well, I think there's two remedies here. The first is simply a declaration of citizenship, which, you know, the Supreme Court has done in the past. But I'm asking sort of a different question, which is you're saying that as written, the second clause of a3 is a violation of the Equal Protection Clause. And my question to you is, how should it be written to avoid it being such? So we put this in our brief, and I apologize I don't have it directly in front of me now, but what it would do is it would extend the same right that's granted to unmarried mothers in former section 1432a3 to fathers by allowing a single father to confer citizenship to his child upon a finding of legal custody. Because legal custody here, again— Okay, let me just interrupt for a moment. There are two clauses in section three. We're not traveling under the first clause. The first clause says the naturalization of the parent having legal custody of the child when there's been a legal separation of the parents. There's no legal separation here, so we're not traveling under that. Or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation. So it doesn't matter whether the mother has custody or not. What matters is just the fact that she's the mother, because it can be established that she's the mother. So how would you—I'm not understanding how you would rewrite this to address the concern that you've raised while still ensuring that there is actually a relationship between the parent and the child. Right, I understand the concern, and let me just raise a few points. So first, as the government noted in its brief, the government has requested supplemental briefing on the question of the remedy, depending on the scope of the violation here, and we agree to that, and we're happy to provide supplemental briefing. I'm asking you this because it goes to the standing question. I understand. So what we've proposed in our brief, again, it ties back to our argument that what the current or what the former version of Clause 2 does is it creates a proxy for sole custody. And I know that there's some tension here, right? But what it really does is it says a mother can transmit citizenship to her out-of-wedlock child if a paternity has not been established. And that's not necessarily true. Let's say the mother gives her child up, you know, for whatever reason, the child, maybe the child is in foster care or whatever the case may be. The mother doesn't have legal custody of the child, but the child, let's say the mother naturalizes before the child becomes 18. Under this provision, the child is still entitled to citizenship. So it doesn't really have to do necessarily with legal custody. That's why I'm asking you the question. Right. So in our brief, we've proposed the following language, right? That following the existing version of Clause 2, it would say, for the naturalization of the father, if the child was born out of wedlock and the child is in the legal custody of the father. And even if it's not a perfectly one-to-one correlation there, again, it's possible that there could be circumstances in which an out-of-wedlock mother did not, no longer had legal custody, as you mentioned. I'm not aware of any cases where that's come up. No court has ruled on that, and neither of the parties here have briefed it. Let me ask a quick follow-up to Judge Rosenbaum's point. And my sort of question is more about the merits than standing. It seems like the current statute treats fathers and mothers equally, and that your proposal would be to treat them disequally. And the reason I say that is because it basically says, this current statute says, look, if you've only got a mother, if you don't know who your father is, there's no legitimate father, and then your mother's naturalization, her citizenship is what matters. But if there's a father in the picture, then his naturalization, his citizenship matters too. Your proposal would be sort of to take the mother out of the picture, right, and not give her the ability to confer her, have any sort of standing or say-so in the citizenship of her child? I don't think so, Your Honor. How would that not be? Because you're saying that once the father gets custody and is naturalized, then his citizenship is what controls, no matter what the mother's citizenship is. So I think what we're doing is we're eliminating the assumption that one parent is out of the picture, and rather conditioning a transfer of citizenship based on something that's more tailored and based on a real relationship to the child. Yeah, but that's not the way, and I mean, I don't want to belabor the point, but I mean, that's not the way citizenship is conferred in any other context, right? I mean, if you are born in the United States of America, then citizenship is based on just the fact of geographically where you're born. If you're born to a United States citizen abroad, you get citizenship. You don't have to have a relationship with that person. They don't have to like you. You know, it doesn't have to matter. They could give you up for adoption and you still get citizenship, right? Why would, in this one context, everything turn on which parent has the best relationship with the child instead of just the citizenship of parents? Well, the examples of citizenship that you provided, their birthright citizenship and other forms of naturalization where both parents are citizens, it's different from the way that Congress has treated single-parent derivative citizenship, right? And as in the Wynn case, right, that's a case where the court allows for single-parent derivative citizenship, and it expressly does condition that right or condition the right to transfer citizenship upon a real relationship. That's why the conditions for a paternity acknowledgement requirement in Wynn satisfied the Fifth Amendment. So, again, we're simply applying those rules here to a different version of a derivative citizenship statute and asking this court to reach the same result. But what I'd like to just— But isn't your argument, though, in conflict with itself? Because on the one hand, you're saying we have case law that has interpreted the first clause of Section 3, and you've said this doesn't apply because we're under Clause 2 of Section 3. But based on your response to Judge Rosenbaum's question, you're trying to import some of the language of Clause 1 into Clause 2 of Section 3. Here, to Judge Rosenbaum's point, if we're just traveling under Clause 2, there is no of a parent having legal custody. In fact, Clause 2 seems to me to be squarely within the rationale of Wynn in the sense that it's saying the naturalization of the mother, if the child was born out of wedlock and the paternity of the child has not been established by legitimation. Here, Mr. Clement was legitimated by his father, and so he now is—he can only achieve citizenship through both parents. But what is your rationale for pulling in the sole custody issue from Clause 1? Well, so again, we're not challenging Clause 1, the legal separation requirement. But what the Supreme Court in Morales-Santana says is that when you identify a constitutional violation as we have here, ordinarily an extension of benefits is the proper course. And what we're simply saying is that here, the proper course is proper. You know, going back to Morales-Santana, there the court evaluated whether or not to extend or nullify benefits, and it chose nullification because to extend benefits would have imputed to Congress an intent to discriminate against married parents. That was a very different statute. Right, it was a very different—exactly. And it said it required a one-year residency for the mother and a five-year residency for the father. Here, in looking at Clause 2, it just seems to travel—it doesn't have those—that disparity, and it seems to travel under when? Well, just to round out the point about Morales-Santana here, which I think is relevant to your question, what you have here—well, you had a Morales-Santana as a circumstance in which to extend the benefit would have resulted in unmarried parents having to reside for one year in the United States and married parents having to reside for five. And so that was the reason there was a problem. Here, our remedy, the remedy we're proposing, whether it's simply a declaration of citizenship or a reconstruction of the statute, it would simply put married parents and unmarried parents, single and married alike, on equal footing. There's no question that the remedy that we're seeking here would put Mr. Clement's father on equal footing with the ability to transmit citizenship to his son just as his mother could have under a second. So you said to put unmarried parents and married parents on equal footing, but in Provision 1, if his parents were married, he would only achieve citizenship through both parents, so he would lose in that circumstance. Here, with unmarried parents, because he has been legitimated by his father, he also is not going to achieve citizenship. So how are the married and unmarried parents in this case—how is that a different circumstance? So I think Clause 1 here says, right, it refers to the naturalization of the parent having legal custody of the child when there has been a legal separation of the parents. And so what we're doing here with Clause 2 and what our addition of Clause 3 is really to extend that rationale of the circumstances in which the parents never married in the first place, and thus the legal separation isn't possible. And what Congress did in that circumstance is to extend the benefit of derivative citizenship to the unmarried mother under circumstances where legal custody is presumed, at least in most circumstances, Judge Rosenbaum. And what we're asking the court to do is simply to allow for the mirror of that right, to fill the gap in the statute so that an unmarried father can confer the same rights. Thank you, Mr. Andorff. Thank you. We'll give you your full three minutes on rebuttal. Thank you, Your Honor. Ms. Glasser, we'll give you some extra time if you need it. Okay, please report. Please stand by for your first amendment. Could you pull the microphone down and talk a little louder? The petition for review. Is that better? The petition for review in this case should be dismissed for lack of jurisdiction for three separate and distinct reasons. The board's August 31st, 2021 decision is not a final order of removal. Second, the petition for review is not timely as to the immigration judge's denial of petitioner's motion to reopen. And third, petitioner failed to exhaust his administrative remedies at all by affirmatively withdrawing his appeal before the board. Because the court lacks jurisdiction, it cannot reach petitioner's arguments challenging the I'd like to focus my time on addressing the first of these two jurisdictional issues and how they're relevant to the supplemental briefing order that the court issued. But I'm, of course, happy to address any other questions that the court may have. So beginning with the board's decision issued on August 31st, 2021, that decision is not a final order of removal or denial of a motion to reopen such that the... So is it your position that it can't be challenged at all? Yes, Your Honor. Isn't that a problem? I mean, you know, let's say that there is more than one individual with the same name. And for whatever reason, the board makes a mistake and withdraws the appeal of the wrong individual. How does that individual challenge that? Well, I think in that case, the petitioner could file a motion to reconsider the board's order. And that motion to reconsider at that point, if the board denied it, could be petitioned for review to this court. And that would provide an avenue for judicial review. And I think that would be the appropriate course in that situation. Of course, petitioner here didn't file any kind of motion to reconsider. And in fact, isn't contesting that the board erred in granting his request to withdraw his appeal. I mean, in this case, petitioner was given exactly what he asked for. The board received his motion to or received his request to withdraw his appeal and granted it. And under the statute, 1101A47 provides for the definition for what is an order of removal or an order of deportation. And that explains that that's a final order that says that a mailing is deportable or ordering them deported. The board's decision in this case clearly doesn't do that. And nor is it a denial of a motion to reopen because the board didn't get merits on the motion to reopen because petitioner asked to withdraw his appeal. So that being established, the board's decision not being a final order of removal, the court still left the question, what is the final order of removal in this case? Because under 1252, the court has jurisdiction to review petitions for review from a final order of removal. Now, petitioner doesn't contest that the immigration judge's decision in this case denying the motion to reopen is the final order. He admits that on page two of his opening brief in the jurisdictional statement. He states that that's what we're talking about when we're talking about the final order in this case. The problem with petitioner's argument is that he argues that that became final when the board issued its decision on August 31st, 2021. And it's the government's position that that is not consistent with the regulations or the statute in this case. The ACFR 1003.4 provides that when someone submits a written request to withdraw the appeal, then the underlying order, in this case, the immigration judge's denial of a motion to reopen becomes final to the same extent as if no appeal were taken. I'm sorry, can you speak up just a bit? It's very hard to hear you. Yes, I apologize. Maybe if I stand a bit closer as well. All right. So what do you say about the other case? I mean, I think every circuit that has addressed this has said that at the very least, the circuit has the jurisdiction to review the BIA's decision to grant the motion to withdraw or, you know, you don't have to call it a motion, to recognize or whatever you want to call it. Do you have any way to distinguish those precedents? Or are you just asking this to create a sort of clue? Well, I have two points in response, Your Honor. I think the first is that in all of those cases, the Madrigal, the Sixth Circuit case and that line of cases that follows Madrigal, they all deal with a very distinct situation. Granted, under the same regulation, 1003.4, but a different section of that regulation. They were all dealing with a situation where someone was, someone departed from the United States and then the board deemed, as a matter of law, deemed that departure to be the withdrawal of the appeal. That's not what we're dealing with in this case. Petitioner filed a written request to withdraw his appeal and that's dealt with in a different sentence in that regulation. So I think that distinction is important to keep in mind because those cases, none of those courts were addressing a situation where the petitioner, by his own actions, had withdrawn his appeal. And the second point that I would make in response. Yeah, I mean, I get that point. That's an interesting point. But how does that matter for jurisdictional purposes? If, if the board, the board in that case was saying you, by leaving the country, you have withdrawn your appeal. Here, the board is saying by filing this piece of paper, you've withdrawn your appeal. The board's saying the same thing, right? To an extent, yes, Your Honor. I mean, I think the second point that I would make perhaps helps with your, with your concern. I think all of those cases, the Madrigal line of cases, were issued before the Supreme Court's decision in Nisrallah. And the Supreme Court's decision in Nisrallah made very clear that when we're looking to what is a final order of removal, they've interpreted that very, very strictly. Looking to 1107A47, and the court in Madrigal and that line of cases was not operating under that same sort of strict formulation of what is a final order of removal. And I think that's what gets into petitioners' arguments regarding, well, they argue that the board's decision is the functional and logical equivalent of a final order of removal. But I don't think that kind of argument can pass muster after the Supreme Court's decision in Nisrallah. And so then turning to the timeliness bit of things, unless Your Honors have any further questions on, on that portion, the petition for review, then the regulations clearly indicate that the immigration judge's decision is the one that becomes final in this situation. The petitioner takes issue and says that 1003.4 doesn't tell us when the immigration judge's denial of the motion to reopen becomes final. I'm sorry, can I take you back one more time? So you said that the way that a person would get review of this would be to file a motion for reconsideration. And then if the person didn't like the outcome of that, they can seek judicial review. Is that what you said? Yes, Your Honor. Why do you say that the, the order on withdrawal is not a final order? And what makes the, the order on reconsideration of that then a final order if the original one is not? Understood. I think the distinction there is that in terms of motions to reopen and motions to reconsider, this court and others have interpreted the denials of a motion to reopen or a motion to reconsider to be as a final order of removal under 1252A1. And I think that's consistent with what the Supreme Court said in Manta. It said that the, you can, so, so you can turn any order that you say is a non-final order into a final order that is then appealable to the court system just by filing a motion for reconsideration. I mean, doesn't that seem problematic? Yes, Your Honor. I mean. So then what's different about this? I think what's different about this case is again, what I, we keep returning to the fact that petitioners in this situation because of affirmative actions that he took himself, petitioner. Okay. But let's just, I mean, the way you've described it is that the reason that he could file a motion for reconsideration, the reason he could get to judicial review by filing a motion for reconsideration of his, of the order on his motion for withdrawal and losing, right? That's what you said. Yes, Your Honor. Okay. So the fact that he's the one who filed the motion for withdrawal doesn't make it any different from any other order that's not final, right? In the way that you've described it, does it? No, Your Honor. I suppose not, but. Okay. So then the question again is if you can make what you say is a non-final order, a final order that is judicially reviewable by filing a motion for reconsideration, why couldn't you do that in every case? And if you could do that in every case, doesn't that, isn't that a problem? I mean, under the jurisdictional provisions, and if it is, then isn't the answer here that he has no recourse because it's not actually, you can't get to judicial review? Well, I don't think that that is any different from the situation that we have with motions to reopen. When someone files a motion to reopen and that motion is denied, they can't file a petition for review with the court. The agency, of course, needs to know whether those motions to reopen have met the procedural requirements, whether they were filed within a certain amount of time, and then if it denies it, even regardless of the procedural deficiencies, they can file a petition for review. So I don't think that it creates a problem that is newer or different than the current situation. I guess I still don't understand why an order that you say is not final can become appealable just by filing a motion for reconsideration on it. I think that that, I mean, that just goes back to what courts have said in terms of a denial of a motion to reopen is construed as an order of removal under 1252A1. I understand that answer may not be satisfactory to Your Honor, but I think that's the answer that I have. I have one more question on this issue. So, and this is just something I'm struggling with. So your argument is that, look, the statute, the regulations, they say that withdrawing the appeal is effective, so no appeal was taken, and that's why the IJA's decision would be to file a removal at that time. If that's, if we're going to strictly apply that theory, then why did the BIA have to do anything at all, right? The BIA entered an order that did something, right? I mean, I don't know what it was doing. If you look at the regulations to mean what you're saying, then the BIA didn't have to do anything at all, right? I think that is one reading of the regulations. The board may have wanted to make it expressly clear that to petitioner that they heard his request to withdraw and place that in there. Yeah, it just seems like, but it seems like if we adopt the reading of what the board is doing, if we adopt your sort of position on what the board is doing, it's kind of inconsistent with what the board is saying by entering these orders. I mean, am I wrong about that? I guess I'm trying to, I'm struggling to figure out how we can adopt your reading where basically he withdrew, therefore it was as if no appeal was taken, therefore the within 30 days of the IHA's decision with the fact that the board is actually ruling on these motions. I mean, the board could have said, right? I mean, they could have said, no, we're not going to let you withdraw your appeal, right? I mean, that's implicit in their order. I don't see that happening, but. Yeah, I mean, implicit in their order is like they could say that. So that's where I'm having a hard time. It just seems like we're, well, if we said what you're asking us to say, it would be inconsistent with what the board is doing in practice. Well, I think we have to return back to 1101A47B, and that tells us when a final order of removal becomes final. And in that situation, there are two portions to 847B. There's the first in which if the board affirms the underlying order of removal, it becomes final. Well, we obviously don't have that here because the board didn't do anything on the merits. And then the second clause is that it becomes final upon the expiration of the time within which someone could file an appeal for review of the underlying order. And so that's the clause that we have to look to here, 1101A47B. And so at the expiration of that 30-day period following the immigration judge's decision, that because petitioners withdrawn the appeal, that is when the immigration judge's decision became final. I think, could you go on and address the exhaustion argument? So let's just assume that we're going to, just assume the following, that we're going to review something, and at the very least, we believe we have jurisdiction to review whether the board properly granted the motion for withdrawal. But now you have an exhaustion argument that they did not exhaust. What do you say about opposing counsel's argument that the exhaustion statute only applies to aliens? Well, Your Honor, I think what petitioner's argument fails to take into account is that he's asking this court to go one step further even than courts who have looked at exhaustion in the context of citizenship claims. In all of those cases, there was an appeal that was filed to the board, and petitioner then filed a petition for review after that point. Those cases were not dealing with what the court is presented with here, an issue of pure exhaustion. Those cases were dealing in the situation of issue exhaustion. Here, petitioner is effectively petitioning for review directly from the immigration judge's decision, and I'm not aware of any case in which a court of appeals has agreed that the exhaustion requirement doesn't apply to that extent, and petitioner doesn't cite a case that goes quite so far. But here, the issue is whether or not the statute is constitutional, right? That's not something that BIA could, I mean, BIA couldn't say that it's not constitutional, could it? No, Your Honor. So what's the purpose of exhaustion? Well, this court has talked about the importance of exhaustion in its decision in Amaya Atunduaga. It helps in funneling the issues as they're presented to the court. But we've just said that it's not relief that BIA can grant, right? So how can it help? I mean, it seems to me like it's just sort of a futile exercise, right? Well, I don't think so, Your Honor, because at the end of the day, I mean, if the board disagreed with petitioner and found that he'd established citizenship, it could have remanded to the immigration judge for termination of proceedings. It's not just an empty exercise because even though the board couldn't decide on the constitutionality, it couldn't strike down the statute. So it could help us in avoiding the constitutional issue. There are other factual issues that might have been presented in the context of the citizenship claim that the board could have looked at in terms of how the immigration judge weighed them or not weighed them. But I mean, there are other things that the board could have looked at that might have been relevant to his claim other than just determining that the statute weighing in on the constitutionality of the statute. And that's so even though everybody seems to be in agreement as to what the facts are here? Well, petitioner, yes, Your Honor, I think so. Well, I mean, it would be sort of an odd exhaustion requirement if we just apply it. I mean, because usually these citizenship issues, there are facts. I mean, I may be wrong about that, but just a few that I've seen, usually the citizenship question turns on some sort of, you know, I was born on this day when my mother was in this place or whatever, and they're not this sort of broad constitutional claim. So there are things that the BIA could do on like a normal citizenship claim to resolve, right? Yes, Your Honor. And I think that is kind of the point that I was trying to get to, perhaps not quite so artfully, is that in citizenship claims, they often are very wound up in the facts. This case, of course, is a little bit different, but to that end, I don't think that just because this case might be a little bit different in terms of petitioner agrees that the facts as established under the statute as written, he hasn't met those requirements. Yeah. Let me push a little bit on the idea that you floated that there's a difference between failing to raise your citizenship claim in the administrative process, sort of issue, you know, exhaustion, and what he did, which is just basically failing to proceed through the administrative process at all. Why should that matter? What's the logic between drawing that line, for drawing that line? Well, I think that matters because, excuse me, that matters because this is the process for review that has been set up and petitioner needs to pursue his claim to the fullest extent. And then he can file a petition for review before this court. But in this case, he didn't. At every step of the way, when he was presented with those opportunities, he rejected them. He waived his appeal before the immigration judge when the first time around when he merits. He later filed a motion to reopen, but he withdrew it. I mean, this is not the kind of case where the court often sees cases where people have very zealously pursued their claims and ended up before the court. He was presenting arguments. But this just isn't that case. Yeah, but I guess why, so, I mean, so you've got these other courts that have said, well, the exhaustion requirement only applies to aliens. So we've got to determine whether this person is an alien. What I don't, I don't get how your distinction gets us around that reasoning. I think it goes, I guess that goes to petitioner's argument with respect to 1252b5. In essence, he's arguing that 1252b5 trumps all of the other requirements for judicial review. And that isn't the case. If we look to the timeliness, cases addressing timeliness, the court and the Second Circuit and Luna, oh, yeah, look, no, no, no. I'm with you on the 1252b5 stuff. I'm asking about the exhaustion. Why, when the exhaustion statute says the aliens have to exhaust, why don't we have to determine whether he's an alien or a citizen in determining whether to apply that exhaustion statute? Well, I think under the statute, petitioner is acknowledged that he doesn't satisfy the requirements for citizenship under former 1432a3. So under the law, as it's written, he is an alien. Yeah. So you would just say, I mean, so you're, this is kind of the idea that I floated with opposing counsel, which is, yeah, we would have to determine whether you're an alien like under the law, but not whether you could bring sort of a far reaching constitutional challenge to the existing law to try to get some kind of different judicial remedy. That's not necessary to determine. I think that's right, Your Honor. I mean, again, petitioner doesn't contest that he doesn't meet the requirements under the statute as it's written. He simply wants to rewrite the statute by bringing this constitutionality claim. But again, he doesn't, he has not perfected the procedural vehicle that he's bringing to the court and that's his obligation to do. And so to that extent, you know, I understand that there's a constitutional claim, but when you look to the interplay between 1252B5, I mean, excuse me, 1252A2D addressing the provision, which retains jurisdiction to review questions of law and constitutional claims. I know that looking at the interplay between that and B1 is getting to the timeliness issue, which Your Honor is not asking about, but I do think that that is instructive, at least to this point that exhaustion does still matter. 1252B5 doesn't trump every other requirement that's placed on petitioner. All right. Thank you so much, Ms. Blosser. We appreciate your time. Thank you. Mr. Endorf, you have three minutes. Thank you, Your Honors. Just a few quick responses and then I'll get to the issue of transfer. On the timing, the government decides to distinguish between a motion to withdraw and a move by the BAA deeming the appeal withdrawn. The government suggested that those two provisions are in different statutory sections. They're in precisely the same section of the regulation. They use precisely the same language, and that means in the Clark v. Martinez that the same result must apply. We have to look at the lowest part of the denominator of regulatory text when interpreting the regulation. Moreover, the government really has no answer to the regulatory text. You aren't going to distinguish between what it calls pure exhaustion or issued exhaustion. Keep in mind that in Poole, the second circuit case we cite, the issue there was a failure to exhaust because the petitioner did not timely appeal to the BAA. So that was an issue the government wants to distinguish between those two of pure exhaustion. No issue was presented to the BAA. So turning more to the merits, Judge Blosser, you said that you must find jurisdiction to determine whether or not the petitioner is a citizen under the law. And here, I respectfully submit that the Constitution is the law. And there's often a separate basis for jurisdiction here. This Court has said that it retains jurisdiction to decide constitutional plans, even if there was a failure to exhaust. That's the Bing Quan Lin case. So there's really no need to break new ground here, that what we have here is both a citizenship claim, which comes through effectively an exhaustion requirement because it puts an issue of whether or not the petitioner is an alien. But you also have a constitutional claim. Turning to the transfer issue. I have to stop you on that, Mr. Andorff. And the reason is it didn't come up in your initial argument. And so we won't be able to give Ms. Blosser an opportunity to respond. But we do have your argument on the briefs. But if there's something else you want to address in your time that's come up, feel free to do so. I think if the Court has no further questions on the jurisdictional issues or the merits questions, then I thank the Court for allowing and indulging in such a lengthy argument. And I'll rest on the briefs. Thank you, counsel. Thank you.